UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN PATRICK HENNEBERRY,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF NEWARK, et al.,<br><br>Defendants. | Case No. 13-cv-05238-MEJ<br><br>**ORDER RE: MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 89 |

## INTRODUCTION

Pending before the Court is a motion for summary judgment filed by Defendants City of Newark, Newark City Manager John Becker, Newark Police Officer Karl Fredstrom and now-retired Newark Police Commander Renny Lawson. *See* Mot., Dkt. No. 89. Plaintiff John Henneberry filed an Opposition (Dkt. No. 90), and Defendants filed a Reply (Dkt. No. 91). The Court heard oral argument on March 2, 2017 and ordered supplemental briefing on a number of issues. Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **GRANTS IN PART** Defendants' Motion for the following reasons.

## MATERIAL FACTS

For several years leading up to the events at issue in this lawsuit, Plaintiff attended every City Council meeting held by the City of Newark. *See* Henneberry Decl. ¶ 2, Dkt. No. 90-1. During these meetings and at other times, he actively participated in Newark politics, criticizing the salaries of City officials and their decisions to curtail public services. *Id.* ¶¶ 2-8, 18. As a result of his frequent and vocal participation at City Council meetings, Plaintiff was well known to Becker, Fredstrom, and former Defendant and Newark Chamber of Commerce President Linda Ashley. *See* Becker Decl. ¶ 6, Dkt. No. 89-3; Ashley Dep. at 39:16-43:25, Huang Decl. Ex. D,

1    Dkt. No. 90-2; Fredstrom Dep. at 22:6-18, 24:24-25:13, Huang Decl., Ex. C.  They and other

2    Newark City officials felt Henneberry was disruptive, and that he complained too much.  *See*

3    Ashley Dep. at 39:16-41:24 (describing prior interactions where Henneberry complained about

4    City), 42:8-43:25 (Ashley had discussed Henneberry with "a large portion of" the members of the

5    City of Newark, including Becker: the gist of those conversations was that "it was hurtful what

6    Henneberry did to people at the council meetings"); Defs.' Ashley Dep. at 90:15-25 (Plaintiff "has

7    a history of calling the Mayor Hitler, of cussing at him, at cussing at the other council members, at

8    City staff, me.  And when you create a pattern, you expect that pattern to continue.  And we had

9    every reason to believe he would do it again and no reason to belief he wouldn't"), Thornton Decl.

10   Ex. B, Dkt. No. 89-1; Fredstrom Dep. at 22:5-25:16 (recognized Plaintiff's name from prior

11   council and planning meetings where Plaintiff was disruptive and "very loud").

12           Plaintiff saw advertisements about an upcoming State of the City address to be held on

13   April 18, 2013 at a Hilton Hotel in Newark (the "Event").  Henneberry Decl. ¶ 13; *see also* Becker

14   Decl. ¶ 3; Fredstrom Decl. ¶ 4, Dkt. No. 89-3.  He looked up further information about the Event

15   online and was directed to a "Community Events" page on the City of Newark Chamber of

16   Commerce website.  Henneberry Decl. ¶¶ 13-14, *see id.*, Ex. A.  The webpage makes no mention

17   of reservations being required, does not state the Event is private or indicate the Chamber of

18   Commerce is hosting the Event, and states there "will be gallery seating for those who do not

19   attend the luncheon."  *Id.* ¶ 14 & Ex. A.  He also clicked a link on the Community Events page

20   that directed him to a flyer for the Event, which bears the Newark Chamber of Commerce's and

21   the City of Newark's logos and the title "2013 State of the City Address & Showcase Mayor Al

22   Nagy."  *Id.* ¶¶ 14-15 & Ex. B.  The flyer states "Registration & Networking Showcase Open

23   (lunch ticket not req.)" and "Gallery Seating Open (no charge)."  *Id.*, Ex. B.  It describes "New

24   Sponsor Opportunities!" and lists fees associated with different levels of sponsorship; the lower

25   half of the flyer allows attendees to reserve showcase space and order lunch.  *Id.*  The flyer also

26   states "[r]eservations are required by April 16" and directs attendees to pay the Chamber of

27   Commerce online or by mail.  *Id.*

28           At 12:05 p.m. on April 18, 2013, Plaintiff arrived at Event.  Henneberry Decl. ¶ 16.  He

                                                      2

waited in the lobby, filled out a nametag he found at an unstaffed table, helped latecomers fill out nametags, asked them if they were registered to vote, and directed them to the event room. *Id.* ¶ 17. Just before 12:30 p.m., he entered the ballroom, where the Event was taking place; he was not asked whether he had a reservation. *Id.* ¶¶ 18-19. He sat in the back row of the gallery section of the ballroom. *Id.*; *see also* Defs.' Ashley Dep. at 60:2-14. Plaintiff wrote on a pad of paper and did not say a word. Henneberry Decl. ¶ 20.

Becker spotted Plaintiff and found Ashley; he told her he did not want Plaintiff "embarrassing the Mayor" and asked Ashley whether there was "some reason why [Plaintiff] shouldn't be here." Defs.' Ashley Dep. at 55:6-9, 58:18-59:23; *see also* Becker Decl. ¶¶ 6-7. Ashley told Becker that Plaintiff did not have a reservation, stated "we don't let anybody in who doesn't have a reservation," and assured Becker she would "take care of it." Defs.' Ashley Dep. at 55:6-9; *Id.* at 94:5-13 (Ashley told Becker words to the effect that she would get Henneberry to leave because he did not have a reservation, and that Becker understood Henneberry was leaving); *see also* Becker Decl. ¶¶ 7-8 ("Ms. Ashley confirmed that Henneberry did not have a reservation for the Event, and that any person who did not have a reservation was not permitted at the Event. Ms. Ashley then told me that she would take care of the situation, and she walked over to Henneberry."). Becker did not provide any direction to Ashley regarding Plaintiff's removal. Becker Decl. ¶ 10. Within a few minutes of Plaintiff sitting down in the gallery, Ashley informed him he needed to leave because he had not made a reservation. Defs.' Ashley Dep. at 59:22-25; Henneberry Decl. ¶ 20. Ashley did not check whether persons in the gallery had reservations until Becker noticed Plaintiff in attendance. *See* Defs.' Ashley Dep. at 51:10-55:5.

Plaintiff declined to leave, because "[h]e had every right to be there." Defs.' Ashley Dep. at 61:8-9. Ashley replied the Event was not a public event, but a private event run by the Chamber of Commerce, and that Plaintiff did not have a right to be there because he did not make a reservation. *Id.* at 61:10-15; *see also id.* at 80:10-13 (Ashley had rented the room for the Chamber event); Henneberry Decl. ¶ 20; *see also* Becker Decl. ¶ 5 (Event "was not a City of Newark event. I did not have control over who was permitted to attend the event.") Plaintiff explained that he

1   was entitled to attend the meeting under the Brown Act.[1]  Defs.' Ashley Dep. at 61:17-20;

2   Henneberry Decl. ¶ 20.

3       Lawson and a plain-clothed police officer joined Ashley.  Defs.' Ashley Dep. at 61:25-15;

4   *see also* Defs.' Fredstrom Dep. at Ex. 1 (Incident Report) at 5-8 (identifying plain-clothed officer

5   as Shannon Todd), Thornton Decl. Ex. A.  At 12:25 p.m., Ashley informed Lawson that Plaintiff

6   did not have a reservation and she had asked him to leave, but that Plaintiff refused to do so.

7   Defs.' Ashley Dep. at 67:3-12; Lawson Decl. ¶ 4, Dkt. No. 89-4.  Fredstrom was dispatched to the

8   Event "because there was some type of disturbance involving Mr. Henneberry."  Defs.' Fredstrom

9   Dep. at 20:5-21:6.  There is no dispute that Plaintiff refused to leave after being asked to do so;

10  however, there is no evidence Plaintiff was loud, used inappropriate language, was

11  confrontational, or abusive.  Defs.' Fredstrom Dep. at 103:1-105:22; Henneberry Decl. ¶ 20; *see*

12  *also* Lawson Decl. ¶ 10 ("Henneberry's actions were disruptive to the event.  As a result of [his]

13  refusal to leave the Event or otherwise cooperate with requests, the scheduled program was

14  delayed.").

15      Plaintiff contends two uniformed police officers "approached me yanked me out of my

16  seat, and took me into the lobby, and handcuffed me.  After a few minutes, I was taken outside and

17  placed into the back of a patrol car.  Neither police officer spoke with me, nor told me what was

18  happening."  Henneberry Decl. ¶ 21.  Defendants introduce evidence Lawson repeatedly asked

19  Plaintiff to leave and explained what was happening.  Fredstrom Dep. at 26:6-9; 29:22-23, 34:18-

20  35:16; Lawson Decl. ¶¶ 4-5, 7.

21      There is no dispute that, while Henneberry was seated, Lawson and Fredstrom grabbed

22  Plaintiff by the hands and arms and escorted him out of the building using a rear wrist lock.  Defs.'

23  Fredstrom Dep. at 38:16-40:21 & Incident Report at 6.  Fredstrom asked Lawson whether he

24  wanted Plaintiff detained; Lawson responded affirmatively.  *Id*. at 40:22-41:7 & Incident Report at

25

26  [1] The Brown Act provides that a "majority of the members of a legislative body shall not, outside
    a meeting authorized by this chapter, use a series of communications of any kind, directly or
27  through intermediaries, to discuss, deliberate, or take action on any item of business that is within
    the subject matter jurisdiction of the legislative body."  Cal. Gov't Code § 54952.2(b)(1).  There
28  are a number of exceptions to this requirement.  *Id*. §§ 54952.2(c)(1)-(6).

6. At this point, Fredstrom handcuffed Plaintiff and placed him in a patrol car. Incident Report at 6. Fredstrom returned to the conference to investigate the incident. *Id*.

Plaintiff was kept in a patrol car for 30-45 minutes while Fredstrom was conducting his investigation. Henneberry Decl. ¶ 22. Fredstrom took statements from Ashley and several other witnesses who reiterated that they had told Plaintiff or had overheard Plaintiff being told that the Event was private and not open to the public, and that Ashley had asked Plaintiff to leave but he refused. *See* Incident Report at 6-9 (Ashley, Newark City Attorney David Benoun, and two others, all told Fredstrom conference was a private event; Ashley, Todd, and another witness, all told Fredstrom Ashley had asked Plaintiff to leave).[2] One of the witnesses Fredstrom interviewed was Benoun, who

> told me that Linda Ashley had come up to him and said that Mr. Henneberry was at the event and that Henneberry was claiming a violation of the Brown Act. Benoun said that Ashley told him that if Henneberry was to be removed, that Henneberry wanted to speak to the city attorney. Benoun agreed and spoke with Henneberry. Benoun . . . advised Henneberry that this was a private affair, has nothing to do with the city, it's a [Chamber of Commerce] event and that if they ask you to leave, it is within their rights.

Incident Report at 8. Fredstrom determined he had probable cause to arrest Plaintiff for trespassing based on his investigation. Defs.' Fredstrom Dep. at 61:22-62:1. Fredstrom also believed the arrest was supported by Ashley's willingness to sign a Citizen's Arrest form. *Id*. at 62:2-63:9, 73:20-75:12.

Becker did not give Fredstrom or Lawson any directions regarding detaining or arresting Plaintiff. Becker Decl. ¶ 10.

By the time Fredstrom drove Plaintiff to the Newark Police Department, the Event was over, evidenced by the fact that people were leaving. Henneberry Decl. ¶ 22. Fredstrom continued to interview Plaintiff at the police station. Defs.' Fredstrom Dep. at 75:13-19; Henneberry Decl. ¶ 23. Fredstrom arrested Henneberry for violating California Penal Code

---

[2] While Plaintiff declares neither Lawson nor Fredstrom spoke to him or explained what was happening, he does not deny that the other witnesses identified in Fredstrom's Incident Report told him the event was private and/or that he needed to leave. *Cf*. Henneberry Decl. ¶ 21.

Section 602.1(a). *See* Consolidated Arrest Report, Huang Decl. Ex. A. Fredstrom made the decision not to "field cite" Plaintiff at the Newark Police Station. Defs.' Fredstrom Dep. at 94:25-95:5; *see also id*. at 95:10-15 (Newark Police Department policy allows officers either to issue a citation and release somebody from the scene under certain circumstances, or to transport the person to Fremont Jail and have them issue a citation and release the subject after booking). At 2:54 p.m., Fredstrom left the police station to transport Plaintiff to the Fremont Jail. Defs.' Fredstrom Dep. at 88:1-13. Persons booked at the Fremont jail are eligible for "cite and release," and Fredstrom intended to tell the officers booking Plaintiff at Fremont Jail that Plaintiff was eligible for immediate release and citation. *Id*. at 91:20-93:2. The cite and release process can take anywhere from 10 minute to hours, depending on how many people are waiting to be booked. *Id*. at 93:21-94:2. But when they arrived at Fremont Jail, Fredstrom was ordered to take Plaintiff and another arrestee to Santa Rita Jail. *Id*. at 91:12-19, 94:14-16.

Plaintiff was booked into Santa Rita Jail where, instead of being cited and released, he was held for more than thirty hours. Henneberry Decl. ¶ 24. As a result of this experience, Plaintiff has drastically reduced his participation in local government, and has stopped attending City Council meetings. *Id*. ¶ 26.

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where

the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 324-25.

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 250. All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). However, it is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322 (internal quotations omitted).

Additionally, at the summary judgment stage, parties must set out facts they will be able to prove at trial. At this stage, courts "do not focus on the admissibility of the evidence's form . . . . [but] instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citation omitted). "While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citations omitted). Accordingly, "[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001); *Celotex*, 477 U.S. at 324 (a party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *see also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must

1   be made on personal knowledge, set out facts that would be admissible in evidence, and show that

2   the affiant or declarant is competent to testify on the matters stated.").

3                                    **DISCUSSION**

4           After this Court granted in part and denied in part Defendants' Motion to Dismiss (Order,

5   Dkt. No. 75), Plaintiff's remaining claims in this action are as follows: (1) Section 1983 claims

6   against all Defendants based on violations of the First and Fourth Amendments; (2) False

7   Arrest/False Imprisonment claims against Lawson, Fredstrom, and the City of Newark; and (3)

8   Bane Act claims against Lawson, Fredstrom and the City of Newark.  Defendants move for

9   summary judgment as to each of these claims.

10  **A.      Section 1983—Fourth Amendment**

11          1.    <u>Probable Cause</u>

12          The Fourth Amendment requires that an arrest be supported by probable cause.  *Atwater v.*

13  *City of Lago Vista*, 532 U.S. 318, 354 (2001); *Michigan v. Summers*, 452 U.S. 692, 700 (1981) (an

14  arrest generally is unreasonable unless it is supported by probable cause).  An arrest is supported

15  by probable cause if, under the totality of the circumstances known to the arresting officer, a

16  prudent person would have concluded that there was a fair probability that the defendant had

17  committed a crime.  *Luchtel v. Hagemann*, 623 F.3d 975, 979 (9th Cir. 2010); *Beier v. City of*

18  *Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004); *Grant v. City of Long Beach*, 315 F.3d 1081, 1085

19  (9th Cir. 2002).

20          Defendants contend they cannot be liable for wrongful arrest or imprisonment because

21  Fredstrom had probable cause to arrest Plaintiff for trespassing.  In his Opposition, Plaintiff argues

22  the arrest was not lawful because there was no probable cause to arrest him, and because the arrest

23  was motivated by the invidious purpose of chilling his right to free speech and political

24  participation.  He argues the fact Fredstrom changed his mind about the penal code section he used

25  to charge Plaintiff demonstrates Defendants lacked probable cause to arrest him in the first place.

26  He argues the fact Fredstrom suggested to Ashley that she sign a Citizen's Arrest form further

27  demonstrates Defendants lacked probable cause.  During the hearing, Plaintiff clarified that he

28  does not base his Fourth Amendment claim on any excessive force allegations.

                                          8

United States District Court
Northern District of California

a.     Fredstrom

Fredstrom arrested Plaintiff pursuant to California Penal Code section 602.1(a), a

misdemeanor, which provides that:

> Any person who intentionally interferes with any lawful business or
> occupation carried on by the owner or agent of a business
> establishment open to the public, by obstructing or intimidating
> those attempting to carry on business, or their customers, and who
> refuses to leave the premises of the business establishment after
> being requested to leave by the owner or the owner's agent, or by a
> peace officer acting at the request of the owner or owner's agent, is
> guilty of a misdemeanor, punishable by imprisonment in a county
> jail for up to 90 days, or by a fine of up to four hundred dollars
> ($400), or by both that imprisonment and fine.

"[A] violation of § 602.1 has two elements: (1) intentional interference, and (2) refusal to leave."

*Dubner v. City and Cty. of S.F.*, 266 F.3d 959, 966 (9th Cir. 2001).  Under this statute,

"interference" requires obstruction or intimidation, not mere presence.  *See, e.g., Hamburg v. Wal-*

*Mart Stores, Inc.*, 116 Cal. App. 4th 497, 511 (2004), *as modified* (Mar. 3, 2004) (while there was

evidence that fifteen persons were on store property, and some were collecting signatures for a

petition, "nowhere in the police report is there any suggestion that the officers on the scene

believed appellants or other protestors were intentionally interfering with Wal–Mart's business by

obstructing or intimidating its customers or otherwise engaging in any criminal act"); *Han v. City*

*of L.A.*, 2016 WL 2758241, at *6 (C.D. Cal. May 12, 2016) ("No one disputes that [p]laintiff was

arrested while he was waiting in line to order food" but there was no evidence that plaintiff, who

previously had been banned from the area for distributing pamphlets on veganism, "had obstructed

or intimidated or in any other fashion interfered with any of the businesses in [the area], other than

[d]efendants' contention that [p]laintiff's presence . . . was sufficient to interfere with the

business"); *cf. Chaffee v. Chiu*, 2013 WL 6664785, at *2 (N.D. Cal. Dec. 17, 2013) (probable

cause existed where arresting deputy witnessed "chaos" during Board of Supervisors meeting,

"observed" plaintiff "raising his voice, "'heard' the profanity-laced shouting match between"

plaintiff and others, and was told by witnesses plaintiff had started the disturbance).

The undisputed witness statements memorialized in Fredstrom's Incident Report and the

conversations Fredstrom recalled during his deposition constitute "reasonably trustworthy

1   information sufficient to lead a person of reasonable caution" to believe that the Event was a

2   private event organized by the Chamber of Commerce for which Plaintiff did not have a

3   reservation, that Plaintiff sat in an "area designated for guests (public) who had reserved a spot,

4   but would not be eating (no charge)", and that Plaintiff "was asked politely to leave on several

5   occasions by several [Chamber of Commerce] members." Incident Report at 9; *see also* Defs.'

6   Fredstrom Dep. at 61:12-16. But there is no evidence Fredstrom was informed that Plaintiff had

7   done anything besides refusing to leave after being asked to do so. While it is disputed whether

8   Plaintiff's refusal to leave "caused a delay to the start of the" conference (*id.*), there is no evidence

9   Plaintiff was being disruptive before Ashley and Defendants approached him. At the hearing,

10  Defendants argued the Court should "infer" Plaintiff had an "intent" to disrupt based on his refusal

11  to leave the conference. An inference regarding Plaintiff's intent is insufficient to create a triable

12  issue of fact that Plaintiff in fact caused a disturbance. Defendants thus have not met their burden

13  of showing no genuine dispute exists that Fredstrom had probable cause to arrest Plaintiff under

14  section 602.1(a).

15          Probable cause nevertheless may exist for an arrest "for a closely related offense, even if

16  that offense was not invoked by the arresting officer, as long as it involves the same conduct for

17  which the suspect was arrested." *Gasho v. United States,* 39 F.3d 1420, 1428 n.6 (9th Cir. 1994).

18  The "closely related offense" doctrine crafts a compromise. On one hand, it ensures police

19  officers are not required to charge every arrested citizen with every offense for which the officer

20  thought the citizen could be held in order to ensure that at least one charge would survive probable

21  cause. On the other, it ensures police officers are not allowed to provide ex post facto

22  justifications to justify sham arrests. *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 950-51

23  (9th Cir. 2003) (while doctrine did not apply because crime initially charged and crime later

24  offered as justification did not arise out of same conduct, court nonetheless found qualified

25  immunity because no concerns about sham arrest were implicated). "As long as the officers had

26  some reasonable basis to believe [Plaintiff] had committed a crime, the arrest is justified as being

27  [] based on probable cause. Probable cause need only exist as to any offense that could be charged

28  under the circumstances." *Id.*; *see also Blankenhorn v. City of Orange*, 485 F.3d 463, 473-75 (9th

Cir. 2007) (applying *Bingham* and finding probable cause existed where suspect was arrested for trespassing in violation of California Penal Code section 602(j), but ultimately charged with trespassing in violation section 602(n).)

The Court finds there is no dispute that Fredstrom had probable cause to arrest Plaintiff for violating Penal Code section 602(o). Section 602 lists trespasses constituting misdemeanors, and includes

> [r]efusing or failing to leave land, real property, or structures belonging to or lawfully occupied by another and not open to the general public, upon being requested to leave by (1) a peace officer at the request of the owner, the owner's agent, or the person in lawful possession, and upon being informed by the peace officer that he or she is acting at the request of the owner, the owner's agent, or the person in lawful possession, or (2) the owner, the owner's agent, or the person in lawful possession.

Cal. Penal Code § 602(o). Land "not open to the general public" includes otherwise "public property that is temporarily closed to all but ticket-buying members of the public":

> [T]he Court concludes that the California Supreme Court would define property "not open to the general public" to include property open only to ticket-buyers. In reviewing criminal trespass convictions for entry onto public property, courts in other jurisdictions have distinguished between areas of public facilities for which a ticket is required, and areas which anyone may enter. [Cite.] Courts addressing the analogous problem of determining whether areas of a public stadium constitute public forums for free speech purposes have distinguished between areas open to the non-ticket buying public and areas for which a ticket is required. [Cite.] The California Supreme Court, in defining the state constitutional protections for speech in privately-owned shopping centers, has emphasized that the owners of such centers allow the public to enter and exit freely. [Cite.]. Here, it is uncontroverted that tickets were required to enter Blair Field during the game at which the plaintiffs were seized. [Cite.] The field was not open to the public without permission from the baseball team. This element of [trespass] was therefore present at the time Sergeant Jacobson made his determination of probable cause.

*James v. City of Long Beach*, 18 F. Supp. 2d 1078, 1084-85 (C.D. Cal. 1998).[3] While the hotel at

---

[3] Plaintiff argues this case is distinguishable because the stadium charged for tickets, while the gallery seating was free. *See* Opp'n at 16-17. The Court does not find this distinction relevant: the *James* Court focused on *permission* from the baseball team, not the cost of attendance. *See also Garcia v. City of Santa Clara*, 2016 WL 7212192, at *3-4 (N.D. Cal. Dec. 13, 2016) (whether a property is "open to the general public" hinges on whether patrons must obtain permission to enter.") Thus, farmers' markets, fast food restaurants, and department stores all "have

which the Event was held was open to the public, it is undisputed that Lawson, Benoun, and Ashley, among others, told Fredstrom the room in which the Event took place was only open to persons who made reservations and thus was not open to the general public for the duration of the Event.

The totality of the circumstances thus reasonably could lead a reasonable officer to believe that (1) the Newark Chamber of Commerce was hosting a private event that was only open to persons having reservations, i.e., that it was not open to the public; (2) Ashley, as then-President of the Chamber of Commerce, was a person in lawful possession of that space; (3) Plaintiff had refused to leave the conference room upon Ashley's request; and (4) Plaintiff again refused to leave the conference upon Lawson's request at Ashley's behest. Accordingly, Fredstrom would have had probable cause to arrest Plaintiff for violating section 602(o) based on the same conduct that lead him to arrest Plaintiff for violating section 602.1(a).

Because there is no dispute Fredstrom had probable cause to arrest Plaintiff under the closely related arrest doctrine, the Court grants summary judgment to Fredstrom on Plaintiff's Fourth Amendment claim. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

> b. *Becker and Lawson*[4]

There is no evidence that Becker arrested Plaintiff or participated or directed his arrest. On the contrary, Becker declares he did not provide any direction to Ashley, Lawson, or Fredstrom regarding Plaintiff's removal or arrest. Becker Decl. ¶ 10. At the hearing, Plaintiff argued the "implication" of Becker's statements to Ashley constituted a "very clear" direction to have Plaintiff *arrested*. This statement is not based on personal knowledge, lacks foundation, and is insufficient under Federal Rule of Civil Procedure 56(c)(4) to create a genuine dispute about Becker's participation or direction. At most, Plaintiff has alleged facts sufficient to show Becker directed his *removal* from the ballroom. This does not constitute evidence supporting a false arrest claim. *See, e.g., Jones v. Town of Quartzsite*, 2014 WL 4771851, at *6 (D. Az. Sept. 24,

---

unquestionably been deemed 'open to the general public.'" *Id.* at *3.

[4] Plaintiff has not identified any deposition testimony by Becker or Lawson, and relies instead on the testimony of Fredstrom and Ashley to meet his burden on summary judgment.

12

2014) (plaintiff failed to state a claim for wrongful arrest where plaintiff only alleged removal from meeting).

Similarly, while there is evidence that Lawson told Fredstrom to "detain" Plaintiff, there is no evidence Lawson instructed Fredstrom to arrest him. Defs.' Fredstrom Dep. at 40:22-41:13. There is a distinction between detention and arrest:

> there is nothing ipso facto unconstitutional in the brief detention of citizens under circumstances not justifying an arrest, for purposes of limited inquiry in the course of routine police investigations. [Cite.] A line between reasonable detention for routine investigation and detention which could be characterized as capricious and arbitrary cannot neatly be drawn. But due regard for the practical necessities of effective law enforcement requires that the validity of brief, informal detention be recognized whenever it appears from the totality of the circumstances that the detaining officers could have had reasonable grounds for their action. A founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing.

*Wilson v. Porter*, 361 F.2d 412, 415 (9th Cir. 1966). Based on the totality of the circumstances, Lawson had reasonable ground for ordering Fredstrom to detain Henneberry; Fredstrom did so and conducted his investigation. Plaintiff argued at the hearing that Lawson's instruction, combined with the fact a second unit was called to the hotel, "implied" to Fredstrom he should arrest Plaintiff. Again, Plaintiff's interpretation is not based on personal knowledge, lacks foundation, and amounts to speculation. It is insufficient to create a genuine dispute about Lawson's participation or direction in Plaintiff's arrest.

Because Plaintiff has identified no evidence that these Defendants participated, directed, or otherwise caused his arrest, the Court grants summary judgment on the Fourth Amendment claim to Becker and Lawson.

### c. City of Newark

Plaintiff argues the City of Newark is liable for the violation of his rights through Becker's conduct. *See* Opp'n at 22-23. Because Plaintiff has failed to establish a genuine issue of fact exists with respect to Becker's liability as to his Fourth Amendment claim, the Court also grants summary judgment on this claim to the City of Newark.

2.    <u>Invidious Purpose</u>

Plaintiff argues that, because his arrest was for the "invidious purpose of interfering with his right to freedom of speech guaranteed under the First Amendment," he does not need to establish a lack of probable cause. *See* Opp'n at 21. But the cases Plaintiff cites for this proposition do not support it. *Cabrera v. City of Huntington Park* primarily addresses statute of limitations and accrual issues, and in fact states: "To prevail on his § 1983 claim for false arrest and imprisonment, [plaintiff] would have to demonstrate that there was no probable cause to arrest him." 159 F.3d 374, 380 (9th Cir. 1998). In *Murgia v. Municipal Court*, the trial court denied a motion on the ground that alleged discriminatory prosecution, even if established, could not constitute a defense in criminal proceedings. The California Supreme Court reversed:

> Neither the federal nor state Constitution countenances the singling out of an invidiously selected class for special prosecutorial treatment, whether that class consists of black or white, Jew or Catholic, Irishman or Japanese, United Farm Worker or Teamster. If an individual can show that he would not have been prosecuted except for such invidious discrimination against him, a basic constitutional principle has been violated, and such a prosecution must collapse upon the sands of prejudice.

15 Cal. 3d 286, 290 (1975). *Murgia* does not apply here. First, Plaintiff voluntarily withdrew his equal protection claim. *See* Dkt. No. 15 at 2. Second, he does not identify any evidence that suggests Defendants singled out an invidiously selected class for special prosecutorial treatment or that he was a member of such a class—he argues only that he was prosecuted to prevent him from engaging in free speech. *See* Opp'n at 21. The Court provided Plaintiff the opportunity to further brief his argument that First Amendment retaliation negates probable cause for his arrest. *See* Suppl. Br. Order at 1, Dkt. No. 95. While Plaintiff does not concede the issue, the cases he cites confirm this argument is properly asserted in support of his First Amendment retaliation claim—not his Fourth Amendment claim. *See* Suppl. Br. at 1-2, Dkt. No. 97. The Court will address that argument below.

3.    <u>Flip Flopping & Citizen's Arrest</u>

Plaintiff argues his Arrest Report shows Fredstrom "did not know what violation to charge Plaintiff with" because someone crossed off § 602.1(a) on the report, wrote § 602(o) below it, then

14

crossed out that section and wrote § 602.1(a) below it. *See* Opp'n at 7-8; Consolidated Arrest Report. The Court sustains Defendants' objections that Plaintiff's counsel has not shown she personal knowledge of the document or of the meaning of the cross-outs. *See* Reply at 2. Moreover, as discussed above, Fredstrom can establish probable cause based on the closely related arrest doctrine.

Plaintiff also argues the fact Fredstrom convinced Ashley to complete a Citizen's Arrest form demonstrates he lacked probable cause to arrest him. *See* Opp'n at 7. Ashley testified Fredstrom initiated the conversation about signing a Citizen's Arrest form and told her the "only" way to remove Plaintiff from the Event was to have Ashley sign the form. *See id*. (citing Ashley Dep. at 78:6-12). This admission by Fredstrom is of minimal probative value in light of the other evidence in the record. As discussed above, based on the totality of the circumstances, Fredstrom had probable cause to arrest Plaintiff. In addition, Fredstrom testified he believed he had probable cause to arrest Plaintiff for trespassing based on his investigation, and that it was his practice "in a lot of cases" to use Citizen's Arrests to "bolster" the arrest. Fredstrom Dep. at 71:6-18; *see also* Defs.' Fredstrom Dep. at 61:6-62:18, 72:9-75:12 (Fredstrom believes arrest was proper based on both probable cause and on Citizen's Arrest). That Fredstrom told Ashley a Citizen's Arrest was the "only" way to secure Plaintiff's removal does not create a genuine dispute that, based on the evidence before the Court, Fredstrom lacked probable cause to arrest Plaintiff.

The edited Consolidated Arrest Report and the Citizen's Arrest Form do not create a genuine dispute whether Fredstrom had probable cause to arrest Plaintiff.

> ### d.    Summary

For the foregoing reasons, the Court grants all Defendants' Motion for Summary Judgment as to Plaintiff's Fourth Amendment claim.

## B.    Section 1983—First Amendment

### 1.    Elements

To prevail on a First Amendment retaliation claim, Plaintiff must show Defendants' (1) action "would chill or silence a person of ordinary firmness from future First Amendment activities" and (2) their "desire to cause the chilling effect was a but for cause of the [their]

action." *Holland v. City of S.F.*, 2013 WL 968295, at *5 (N.D. Cal. Mar. 12, 2013) (quoting *Skoog v. Cty. of Clackamas,* 469 F.3d 1221, 1232 (9th Cir. 2006) (internal quotation marks and citation omitted)).

Generally, "the general public does not . . . have a First Amendment right to access private property for expression." *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1137 (9th Cir. 2011) (citing cases). The United States Supreme Court "has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only." *Lloyd Corp. v. Tanner*, 407 U.S. 551, 568 (1972). The general public also does not generally have a First Amendment right to access public property for expression when access to that property is restricted to persons having permission to enter. *See supra* at [12] (citing cases, including *Garcia*, 2016 WL 7212192, at *3-4 (whether a property is "open to the general public" hinges on whether patrons must obtain permission to enter.")).

2.  Analysis

Defendants argue Plaintiff's removal and subsequent arrest did not violate his First Amendment rights because the State of the City Address was a private event Plaintiff was not entitled to attend. They identify evidence showing the Event was a private affair hosted by the Newark Chamber of Commerce, a private entity, which had rented a ballroom at the Hilton Hotel for that purpose. *See* Defs.' Ashley Dep. at 89:17-90:1; Becker Decl. ¶¶ 4-5 (the 2013 State of the City Address and Showcase "was not a City of Newark event"); Defs.' Fredstrom Dep., Ex. 3 at 2 (article in Newark News states gallery seating will be available, and that "anyone who wishes to hear what has been happening in Newark over the past year and what is on the horizon" may contact the Chamber "to reserve a space."); Incident Report at 6 (according to Fredstrom, in speaking to Plaintiff, Ashley "stated that this was a [Chamber of Commerce] event and not a [C]ity event. Ashley said that she hosted, paid for the event and that all the people in the room had made reservations to attend. Ashley added that all five of the City Council members were present and that the Mayor (Al Nagy) was the only person speaking at this event."). Ashley testified reservations were required, even to attend the free gallery seating Plaintiff utilized. *See*

16

Defs.' Ashley Dep. at 61:21-24. She testified attendees made reservations for the luncheon, and that several also made reservations for the gallery. *Id.* at 11:2-13:10 & Ex. 2. Based on this evidence, Defendants contend the State of the City was a private event, held in a private space, and Plaintiff had no right to attend it because he lacked reservations.

But Plaintiff demonstrates the flyers and other materials announcing the Event advertised "free gallery seating" for the public. These materials are at the very least ambiguous about whether persons seated in the gallery needed reservations for what was advertised on the Chamber of Commerce's website as a "Community Event." Plaintiff declares no one was monitoring the ballroom's entry or exit, no one asked him if he had a reservation, and there was no indication that the Event was not open to the public. Henneberry Decl. ¶ 18. While there is evidence some gallery attendees reserved seats, Ashley also testified she did not check whether gallery attendees had reservations until Becker pointed out Plaintiff was there. The evidence establishes no one associated with the Event seemed interested in checking whether persons in the gallery had reservations until Becker noticed Plaintiff in attendance. The evidence also establishes there was ample seating available in the gallery. *Id.* ¶ 19.

While the Event may have been organized by a private organization, the Chamber of Commerce, Plaintiff has established a genuine dispute exists as to whether entry to the Event was in fact restricted to persons with reservations—or just restricted to him based on his prior political advocacy. Based on this finding, the Court need not evaluate the evidence supporting Plaintiff's contention the State of the City Address was a public meeting as defined by the Brown Act.

     *a.*    *Becker*

The evidence shows that for several years, Plaintiff had actively and vocally criticized City of Newark officials and attended City Council meetings. Becker and Ashley knew Plaintiff and felt he had been disruptive at prior events. Becker approached Ashley and asked her whether she knew Plaintiff was there, and whether there was any reason he should not be there. Ashley confirmed Plaintiff did not have a reservation, people without reservations were not allowed at the event, and she would take care of the situation. Ashley testified she told Becker "something to the effect" of "I will get him to leave." At the time Ashley approached Plaintiff in the ballroom

gallery and asked him to leave, Plaintiff was seated quietly and taking notes.  There is no evidence Plaintiff caused any disruption until he was asked to leave.

As discussed above, Plaintiff has created a genuine dispute whether the event was open to the public.  Removing an individual from a public meeting does not violate the individual's First Amendment rights, "provided the individual is sufficiently disruptive and is not removed because of his or her views."  *Dehne v. City of Reno*, 222 Fed. App'x 560, 562 (9th Cir. 2007) (citing cases); *see also Acosta v. City of Costa Mesa*, 718 F.3d 800, 811 (9th Cir. 2013) (municipalities can enforce rules of decorum to remove citizens from city council meetings if attendee "actually" disturbs or impedes meeting).  Becker declares he did not direct Ashley regarding Plaintiff's removal and did not intend to chill Plaintiff's First Amendment rights.  But given Becker and Ashley's familiarity with Plaintiff's history at City-sponsored events, a reasonable trier of fact could conclude that Becker's singling Plaintiff out among other attendees and asking Ashley whether there was some reason why Plaintiff should not be there, intimated to Ashley in unmistakable terms that Plaintiff should be removed because Becker did not want Plaintiff to disturb the Event as he had disturbed other events in the past.  "[F]ear or apprehension of disturbance is not enough to overcome the right to freedom of expression."  *Norse*, 629 F.3d at 979 (Kozinski, J. concurring) (quotation marks and citation omitted); *cf. Reza v. Pearce*, 806 F.3d 497, 504 (9th Cir. 2015) (reversing grant of summary judgment to defendant, a senator who had requested plaintiff be removed from hearing on immigration bill after plaintiff was disruptive, and banned plaintiff from returning to state senate building indefinitely:  "imposing a complete bar" on entering the building "clearly exceeds the bounds of reasonableness clearly established by *White, Kindt,* and *Norse* as a response to a single act of disruption.").

A reasonable trier of fact could conclude Becker approached Ashley to trigger Plaintiff's removal based on a fear of future conduct by Plaintiff, was told by Ashley that she would get Plaintiff to leave, and communicated satisfaction with her response.  Because Plaintiff was not "sufficiently disruptive" to warrant removal from a public meeting, a genuine issue of material fact exists whether Becker violated Plaintiff's First Amendment rights by encouraging Ashley to remove Plaintiff.

### b. Fredstrom

The fact that Fredstrom had probable cause to arrest Plaintiff "is not dispositive" to Plaintiff's First Amendment retaliation claim, but it "ha[s] high probative force." *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 901 (9th Cir. 2008). Although there "is almost always a weak inference of retaliation whenever a plaintiff and a defendant have had previous negative interactions[,]" where there is "very strong evidence of probable cause and very weak evidence of a retaliatory motive[,]" a case cannot survive summary judgment. *Id*. (citing *Skoog*, 469 F.3d at 1225-32); *see also Maidhof v. Celaya*, 641 Fed. App'x 734, 735 (9th Cir. 2016) (reviewing denial of summary judgment on qualified immunity defense and reversing decision because plaintiffs had not shown "specific, nonconclusory evidence of a retaliatory motive.").

While there is very strong evidence of probable cause, there is more than "very weak" evidence of a retaliatory motive. There is specific, nonconclusory evidence that (1) Fredstrom knew Plaintiff from prior encounters at City Council and City Planning Meetings, where he had found Plaintiff "very loud" and disruptive; (2) as a result of these past interactions, Fredstrom in fact recognized Plaintiff by name when he was dispatched to the Hilton Hotel during the Conference; (3) Lawson instructed Fredstrom to detain Plaintiff, but he did not direct Fredstrom to arrest Plaintiff; and (4) even after arresting Plaintiff, Fredstrom had the discretion to cite and release him from the Newark Police Station, but he made the decision not to do so and instead drove Plaintiff to be booked at the Fremont City Jail.

Defendants argue no liability can attach for failing to cite and release Plaintiff because Fredstrom, pursuant to the "clear and unambiguous" language of Penal Code § 853.6, had the discretion to book Plaintiff instead of citing and releasing him. *See* Mot. at 18-19. But police officers cannot use their discretion to book arrestees in retaliation for exercising First Amendment rights. In *Ford v. City of Yakima*, 706 F.3d 1188, 1190-91 (9th Cir. 2013), a driver arrested for violating a noise ordinance alleged he was in fact arrested in retaliation for exercising his First Amendment rights. The district court granted summary judgment to the defendants, finding they had probable cause to arrest plaintiff. The Ninth Circuit reversed, holding that probable cause did not mean the booking and jailing necessarily was constitutional, and that a jury would need to

19

decide whether the arresting officers' retaliatory motive was a but-for cause of their action. *Id*. at 1194-95. In rejecting the application of qualified immunity, the Ninth Circuit found a "reasonable officer would have understood [in 2007] that he did not automatically possess the authority to book and jail an individual upon conducting a lawful arrest supported by probable cause. . . . [A] reasonable police officer would have understood that he could not exercise his discretion to book an individual in retaliation for that individual's First Amendment activity." *Ford*, 706 F.3d at 1196 ("*Duran*[ *v. City of Douglas, Arizona*, 904 F.2d 1372, 1375-78 (9th Cir. 1990)] clearly established that police officers may not use their authority to punish an individual for exercising his First Amendment rights, while *Skoog*[, 349 F.3d at 1235] clearly established that a police action motivated by retaliatory animus was unlawful, even if probable cause existed for that action. . . . While the precise issue of retaliatory booking and jailing has not been addressed in this Circuit, 'closely analogous preexisting case law is not required to show that a right was clearly established.'").

Defendants have not introduced evidence about Fredstrom's reasons for choosing to exercise his discretion and book Plaintiff instead of citing and releasing him.[5] *Cf. Maidhof*, 641 Fed. App'x at 735 (officer who had discretion to issue citation at scene or at arresting agency, testified he decided to transport arrestees to Santa Rita instead in order to avoid disruptive or possibly violent confrontations with protestors and because university Operational Plan called for protestors with prior arrests to be transported to Santa Rita). Despite Fredstrom's conclusory disavowal of any retaliatory motive (Fredstrom Decl. ¶ 5), based on the evidence in the record, a reasonable trier of fact could find a primary motivation for Fredstrom's decision to arrest and book Plaintiff into jail, rather than cite and release him from the Newark Police Department, was to retaliate against Plaintiff for his prior free speech activity and was intended to chill Plaintiff's free

---

[5] Plaintiff argues Fredstrom justified his decision based on his concern Plaintiff would return to the hotel to disrupt the Event, but that this decision was pretextual since the event had ended by the time Fredstrom drove Plaintiff away. Opp'n at 8, 19-20. To support this argument, Plaintiff purports to quote a passage from Fredstrom's testimony. *See id.* at 8 (Plaintiff refers to "p. 3-9"); *id.* at 19 (referring to "89:3-9"). Pages 3-9 are not included in the deposition transcript either party filed in connection with this Motion, and the Court has not found the passage quoted in either transcript, including on page 89.

20

speech. "The possibility that other inferences could be drawn that would provide an alternate explanation for [defendant's] actions does not entitle [him] to summary judgment." *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1303 (9th Cir. 1999) (reversing grant of summary judgment to defendants on First Amendment retaliation claim because "evidence is sufficient to raise a genuine issue of fact as to whether the appellants intended to interfere with the appellees' political activities . . . ."). A reasonable trier of fact also could find this type of arrest would chill a person of ordinary firmness from future First Amendment activities. *See Ford*, 706 F.3d at 1193 (retaliatory police action such as arrest would chill a person of ordinary firmness from future First Amendment activities). A reasonable trier of fact also could find this incident chilled Plaintiff from future political participation. *See* Henneberry Decl. ¶ 26. The Court accordingly finds, in the light most favorable to Plaintiff, the evidence creates a genuine dispute of material fact and denies Fredstrom's Motion for Summary Judgment as to Plaintiff's First Amendment claim.[6]

       *c.*    *Lawson*

Plaintiff identifies no evidence that Lawson knew him prior to removing him from the Event, or that anyone informed Lawson of Plaintiff's past interactions with City of Newark officials. The evidence only shows that Ashley and Becker, among others, informed Lawson that the Event was a private affair and that Plaintiff was trespassing. Lawson removed Plaintiff from the Event and indicated to Fredstrom that he wanted Plaintiff detained. A brief informal detention for purposes of routine investigation under these circumstances would be distinct from an arrest. *See Wilson*, 361 F.2d at 415.

There is no evidence Lawson ordered Fredstrom to arrest Plaintiff or had any part in deciding not to cite and release Plaintiff, or to book him in jail. Plaintiff has identified no evidence Lawson's conduct was motivated by any retaliatory animus. *See Dietrich*, 548 F.3d at 901 (where evidence of retaliatory motive is weak, and of probable cause is strong, case cannot

---

[6] The Court recognizes that the evidence of retaliatory motive, while specific and non-conclusory, is circumstantial. There simply is no direct evidence that Fredstrom's conduct was retaliatory. But because Defendants have failed to rebut the circumstantial evidence of retaliatory motive with anything other than Fredstrom's conclusory statement in his declaration, the Court finds Plaintiff has succeeded in creating a triable issue of fact, and that it is appropriate for a jury to decide the issue at trial based on the evidence presented to them.

survive summary judgment). Plaintiff has not established a genuine dispute of fact exists whether Lawson violated his First Amendment rights, and the Court accordingly grants Lawson summary judgment on this claim.

### 4. Qualified Immunity

Defendants assert that, even if the Court finds they violated Plaintiff's Constitutional rights, they are entitled to qualified immunity because it would not have been clear to them that their conduct was unlawful. Mot. at 25.

> Determining whether an official is entitled to summary judgment based on the affirmative defense of qualified immunity requires applying a three-part test. First, the court must ask whether "[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right?" If the answer is no, the officer is entitled to qualified immunity. If the answer is yes, the court must proceed to the next question: whether the right was clearly established at the time the officer acted. That is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." If the answer is no, the officer is entitled to qualified immunity. If the answer is yes, the court must answer the final question: whether the officer could have believed, "reasonably but mistakenly . . . that his or her conduct did not violate a clearly established constitutional right." If the answer is yes, the officer is entitled to qualified immunity. If the answer is no, he is not.

*Skoog*, 469 F.3d at 1229 (internal citations omitted).

#### a. *Violation of a Constitutional Right*

As discussed above, Plaintiff has established the existence of genuine dispute as to whether Becker and Fredstrom violated his First Amendment rights by retaliating against him for past free speech activities. But Plaintiff has not created a genuine dispute of fact that Lawson violated his Constitutional rights; accordingly, the Court need not consider whether Lawson is entitled to qualified immunity.

#### b. *Clearly Established*

Next, the Court must determine whether these rights were "clearly established" at the time of Plaintiff's arrest in April 2013.

With respect to Becker, it was clearly established by April 2013 that attendees could only be removed from public meetings if they were actively disturbing the proceedings. *See supra*.

When Becker triggered Plaintiff's removal from the Event, Plaintiff was seated quietly and not disrupting the proceedings. As such, it would have been clear to a reasonable officer in Becker's position that arresting Plaintiff was unlawful.

With respect to Fredstrom, it also was clearly established in April 2013 that officers could not exercise their discretion to "automatically" book individuals even though they had probable cause to arrest them if the booking officer was retaliating against the individual for exercising his or her First Amendment rights. *See Ford*, 706 F.3d at 1196 (finding in February 2013 that this right was clearly established in 2007). Based on the Ninth Circuit's opinion in *Ford*, the Court finds a reasonable officer would have known in April 2013 that he could not exercise his discretion to book Plaintiff in retaliation for Plaintiff's First Amendment activity.

### c.    *Reasonable Mistake*

Finally, the Court must determine whether Becker or Fredstrom "reasonably but mistakenly" could have believed their conduct did not violate a Constitutional right. Qualified immunity applies whether the error is a mistake of law or fact, or mixed question of law and fact. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Becker could reasonably have believed the Conference was not a public event: the evidence establishes he believed it was a private event organized by the Chamber of Commerce at a private hotel, and not a City of Newark event. Ashley informed him that reservations were required and that Plaintiff did not have one. Based on the evidence before the Court, Becker reasonably could have believed Plaintiff was intruding on a private party, and reasonably could believe having Plaintiff removed from the private party did not violate Plaintiff's rights. As a result, the Court finds Becker is entitled to qualified immunity.

With respect to deciding to book Plaintiff in retaliation for exercising his First Amendment rights at the Event and/or prior events, there is nothing in the record that suggests Fredstrom reasonably believed his conduct did not violate Plaintiff's rights. His conclusory declaration that he did not intend to interfere with Plaintiff's First Amendment rights does not establish the grounds for reasonable mistake; at most, it creates a triable issue of fact whether Fredstrom acted in retaliation. Accordingly, Fredstrom is not entitled to qualified immunity at this point.

23

5.     *Monell* liability for City of Newark

A local government entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). When an individual sues a municipality for violation of a constitutional right, the municipality is liable only if the individual can establish that the municipality "had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation he [or she] suffered." *Id.* at 694-95; *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007); *Galen v. Cty. of L.A.*, 477 F.3d 652, 667 (9th Cir. 2007). In order to hold a public entity liable, a plaintiff must demonstrate that the unlawful governmental action was part of the public entity's policy or custom, and that there is a nexus between the specific policy or custom and the plaintiff's injury. *Monell*, 436 U.S. at 690-92, 694-95.

Plaintiff fails to identify any evidence that the City of Newark had a deliberate policy, custom, or practice that was the moving force behind any of the alleged violations he suffered. He does not argue the City of Newark is liable based on Lawson's or Fredstrom's actions; he only contends the City is liable based on Becker's actions as a decision-maker with final authority. *See* Opp'n at 22-23. A single act of a policymaker in some instances can be sufficient for a *Monell* claim when "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986).

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. [Cite.] The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.

*Id.* at 481-83 (citations and footnotes omitted). Municipal liability will attach "only where 'a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in

24

question.'" *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992) (quoting *Pembaur*, 475 U.S. at 483-84). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved." *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24 (1985).

Becker declares on personal knowledge as the City Manager for the City of Newark that he does "not possess final authority, and [does] not have the responsibility, to establish municipal policy for the City of Newark, including any policy for the Newark Police Department. The Newark City Council possesses final authority, and the responsibility, to establish municipal policy for the City of Newark, including policy for the Newark Police Department." Becker Decl. ¶ 3. Plaintiff nonetheless argues Becker is a decision-maker with final authority because the Newark Municipal Code provides that the City Manager has full authority to "control, order and give directions to all heads of departments and to subordinate officers and employees of the city under his supervision" and to "exercise control over and supervise in general all departments and divisions of the city government and all appointive officers and employees thereof. . . ." Opp'n at 22 (quoting Newark Muni. Code § 2.040.070). Because Becker made the deliberate choice to have Plaintiff removed, Plaintiff argues municipal liability attaches. *Id*. Plaintiff's briefing on this issue is anemic. *See id*. Plaintiff did not depose Becker or any person most knowledgeable about the role of City Manager generally, policy making for the Police Department, or policy making for Chamber of Commerce events. Plaintiff, once again, fails to establish any foundation for his interpretation of documents, and fails to establish he or his attorney have personal knowledge of the facts they seek to rely upon in their Opposition.

Based on the present record, the Court cannot find a genuine dispute of material fact exists that Becker had final decision-making authority with respect to any policy relevant to the subject matter. In addition, as noted above, Becker is entitled to qualified immunity because he could reasonably believe removing Plaintiff from the ballroom was lawful because the Event was a private one. As a result, the Court grants the City's Motion for Summary Judgment as to

Plaintiff's First Amendment claim.

**D.      False Arrest/Imprisonment**

Plaintiff did not oppose Defendants' Motion for Summary Judgment directed at his false arrest/imprisonment claim.  *See* Opp'n.  The Court is not clear whether Plaintiff rests on the arguments he used in connection with his Fourth Amendment claim, or whether he is abandoning his parallel state law claim.  In the interest of thoroughness, the Court addresses this claim as well.

1.      Elements

"The tort of false imprisonment is the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time . . . ."  *Hagberg v. Cal. Fed. Bank FSB*, 32 Cal. 4th 350, 372-73 (2004) (alteration in original; quotation and internal marks omitted); *Tekle v. United States*, 511 F.3d 839, 854 (9th Cir. 2007) (recognizing that under California law, "[t]he elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." (quotation marks omitted)).  "[A] false arrest is merely one way in which a false imprisonment may be accomplished—the two are not separate torts."  *Hagberg*, 32 Cal. 4th at 372 n.7 (citation omitted).  Peace officers are not civilly liable for false arrest if "[t]he arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful."  Cal. Penal Code § 847(b).  "The terms 'reasonable cause' and 'probable cause' are interchangeable, and California courts look to cases decided under the Fourth Amendment to determine whether reasonable cause existed for purposes of section 847."  *Holland*, 2013 WL 968295, at *3.

Additionally, "a party who 'authorizes, encourages, directs or assists an officer to do an unlawful act, or procures an unlawful arrest, without process, or participates in the unlawful arrest or imprisonment, is liable.'"  *Garcia v. City of Merced*, 637 F. Supp. 2d 731, 754 (E.D. Cal. 2008) (quoting *Du Lac v. Perma Trans Prods., Inc.*, 103 Cal. App. 3d 937, 941 (1980)) (overruled on other grounds by *Hagberg*, 32 Cal. 4th at 377).  "'[T]he actor is not liable unless his [or her] act is done for the purpose of imposing confinement upon the other, or with knowledge that such a confinement will, to a substantial certainty, result from it.  It is not enough that the actor realizes

or should realize that his [or her] actions involve a risk of causing a confinement, so long as the likelihood that it will do so falls short of a substantial certainty.'" *Id.* (citing *Du Lac*, 103 Cal. App. 3d at 943 (citations omitted)).

While the existence of probable cause renders the arrest reasonable under the Fourth Amendment, and thus constitutional, more is needed to authorize a custodial arrest under California law. *Edgerly v. City & Cty. of S.F.*, 599 F.3d 946, 959 (9th Cir. 2010) (citing *People v. McKay*, 27 Cal. 4th 601 (2002) (holding that state arrest procedures do not limit the constitutionality of arrests under the Fourth Amendment, but emphasizing that that holding "in no way countenance[s] violations of state arrest procedure," as "[v]iolation of those rights exposes the peace officers and their departments to civil actions seeking injunctive or other relief")).

2.    Analysis

The Court already found that Fredstrom had probable cause to arrest Plaintiff, and that Lawson neither arrested nor directed Fredstrom to arrest Plaintiff. Plaintiff identifies no state procedures that were violated in the course of his arrest. While he was eligible for citation and release pursuant to California Penal Code section 853.6, there is "no requirement that a person arrested for a non-Vehicle Code misdemeanor violation must be released without bail or without booking. It is a matter within the discretion of the arresting officer or the booking officer." *People v. Superior Court*, 30 Cal. App. 3d 257, 264 (1973). To the extent Plaintiff bases this claim on the use of excessive force, the only evidence he identifies is that he complained to Fredstrom that his handcuffs were too tight. Henneberry Decl. ¶ 23. Plaintiff does not introduce any evidence that tight handcuffs, under the circumstances of his arrest, violated state arrest procedures.

A municipality is vicariously liable for its employees actions under California law, which "has rejected the *Monell* rule and imposes liability on [cities] under the doctrine of respondeat superior for acts of [city] employees." *See Robinson v. Solano Cty.*, 278 F.3d 1007, 1016 (9th Cir. 2002) (en banc) (citing Cal. Gov't Code § 815.2); *see also Edgerly*, 599 F.3d at 961 (citing *Robinson*). Because the Court grants summary judgment to Fredstrom and Lawson, no vicarious liability attaches to the City on the false arrest/imprisonment claim.

27

**E.     Bane Act**

    1.     Elements

      The Bane Act provides a private right of action against a person who interferes by "threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state . . . ." Cal. Civ. Code § 52.1.  "There are two distinct elements for a section 52.1 cause of action.  A plaintiff must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion." *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015), *as modified on denial of reh'g* (Mar. 6, 2015), *review denied* (May 20, 2015) (citations omitted).

      In assessing whether an overlong detention in County Jail violated the Bane Act, the California Court of Appeal held that "where coercion is inherent in the constitutional violation alleged, i.e., an overdetention in County jail, the statutory requirement of 'threats, intimidation, or coercion' is not met.  The statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself." *Shoyoye v. Cty. of L.A.*, 203 Cal. App. 4th 947, 948 (2012).  In *Shoyoye*, a motorist was arrested for violating the Vehicle Code and held in County Jail for more almost 20 days because County employees negligently assigned a parole hold to him in the computer system and failed to detect the error during quality control; employees could reasonably rely on the information in the computer system.  The Court of Appeal found the motorist did not prove coercion independent from that inherent in wrongful detention, and reversed the judgment entered in the plaintiff's favor on that claim.  *Id.* at 961-62.  But subsequent courts have made clear that *Shoyoye* should not be read to bar a Bane Act claim where a plaintiff asserts his rights were violated by intentional conduct, as opposed to error.  *See, e.g., Holland*, 2013 WL 968295, at *10 (citing cases); *see also Bass v. City of Fremont*, 2013 WL 891090, at *5-6 (N.D. Cal. Mar. 8, 2013) (denying motion to dismiss Bane Act claim where motorist alleged officers detained him based on false claims brake lights did not work and vehicle tags were expired; accused plaintiff of selling and being on drugs; arrested him for driving under the

influence without conducting field sobriety tests; and held him in county jail).

2.    Analysis

No reasonable jury could find Lawson threatened, intimidated, or coerced Plaintiff. However, a reasonable jury could find Fredstrom arrested Plaintiff to chill his constitutionally-guaranteed right to free speech. A reasonable jury could further find that Fredstrom's refusal to cite and release Plaintiff for this misdemeanor from the Newark Police Department and instead to book him at the Fremont City Jail constitutes threats, intimidation, or coercion. The City would be vicariously liable for any damages resulting from Fredstrom's actions. *See Robinson,* 278 F.3d at 1016. For the foregoing reasons, the Court grants summary judgment to Lawson, and denies summary judgment on Plaintiff's Bane Act claim to Fredstrom and the City.

**CONCLUSION**

Based on the analysis above, the Court hereby GRANTS summary judgment as follows:

(1)    to Defendants Becker, Fredstrom, Lawson, and the City on Plaintiff's Fourth Amendment and False Arrest/Imprisonment claims;

(2)    to Defendants Becker, Lawson, and the City on Plaintiff's First Amendment claim;

(3)    to Defendant Lawson on Plaintiff's Bane Act claim.

As a result of this Order, the two claims remaining in this action are (1) a First Amendment retaliation claim against Fredstrom, and (2) a Bane Act claim against Fredstrom and the City of Newark. Both claims are based on the same narrow question: whether Fredstrom's desire to chill Plaintiff from engaging in future First Amendment activities was a but for cause of his decision not to cite and release Plaintiff from the Newark Police Department.

Lead trial counsel for Henneberry, Fredstrom, and the City shall appear for a Case Management Conference before the undersigned on May 11, 2017, at 10:00 a.m. to discuss alternative dispute resolution and trial setting. The parties need not file a Joint Case Management Statement. All currently-scheduled pretrial and trial deadlines are VACATED.

There are no claims remaining against Defendants Becker or Lawson.  The Court shall enter a separate judgment as to these two Defendants.

**IT IS SO ORDERED.**

Dated: April 26, 2017

_____
MARIA-ELENA JAMES
United States Magistrate Judge