1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

JOHN PATRICK HENNEBERRY,

Case No. 13-cv-05238-TSH

8

Plaintiff,

9

v.

**ORDER DENYING DEFENDANTS'
RENEWED MOTION FOR SUMMARY
JUDGMENT**

10

CITY OF NEWARK, et al.,

11

Defendants.

Re: Dkt. No. 224

12
13

**I.    INTRODUCTION**

14

Plaintiff John Patrick Henneberry brings this civil rights action for claims arising from his

15

2013 arrest and incarceration.  After the Court granted summary judgment in part, two claims

16

remain pending: (1) a First Amendment retaliation claim against Defendant Karl Fredstrom, the

17

City of Newark police officer that arrested him; and (2) a claim under the Bane Act, Cal. Civ.

18

Code § 52.1, against Fredstrom and Defendant City of Newark (together, "Defendants").  Order

19

re: Mot. for Summ. J. ("MSJ Order"), ECF No. 98.  The case was scheduled for a jury trial in

20

September 2019; however, on May 28, 2019, the Supreme Court issued its decision in *Nieves v.*

21

*Bartlett*, in which it held: "The plaintiff pressing a retaliatory arrest claim must plead and prove

22

the absence of probable cause for the arrest."  139 S. Ct. 1715, 1724 (2019).  Based on *Nieves*, the

23

Court vacated the trial and ordered Defendants to file a renewed motion for summary judgment.

24

Now pending before the Court is Defendants' renewed motion.  ECF No. 224.  Henneberry filed

25

an Opposition (ECF No. 227) and Defendants filed a Reply (ECF No. 230).  The Court finds this

26

motion suitable for disposition without oral argument and **VACATES** the September 12, 2019

27

hearing.  *See* Civ. L.R. 7-1(b).  Having considered the parties' positions, relevant legal authority,

28

and the record in this case, the Court **DENIES** Defendants' motion for the following reasons.

**A.    Factual Background**

For several years leading up to the events at issue in this lawsuit, Henneberry attended

every City Council meeting held by the City of Newark.  Henneberry Decl. ¶ 2, ECF No. 90-1.

During these meetings and at other times, he actively participated in Newark City politics,

criticizing the salaries of City officials and their decisions to curtail public services.  *Id*. ¶¶ 2-8, 18.

As a result of his frequent and vocal participation at City Council meetings, Henneberry was well

known to Defendants Jon Becker (Newark's City Manager), Officer Fredstrom, and Linda Ashley

(Newark Chamber of Commerce President).  Becker Decl. ¶ 6, ECF No. 89-3; Huang Decl. Ex. D

(Ashley Dep.) at 39:16-43:25, ECF No. 90-2; *id.*, Ex. C (Fredstrom Dep.) at 22:6-18, 24:24-25:13,

ECF No. 90-2.  They and other Newark City officials felt Henneberry was disruptive and

complained too much.  Ashley Dep. at 39:16-41:24 (describing prior interactions with

Henneberry), 42:8-43:25 (Ashley had discussed Henneberry with "a large portion of" the members

of the City of Newark, including Becker: the gist of those conversations was that "it was hurtful

what Henneberry did to people at the council meetings"); Thornton Decl. Ex. B (Defs.' Ashley

Dep.) at 90:15-25, ECF No. 89-1 (Henneberry "has a history of calling the Mayor Hitler, of

cussing at him, at cussing at the other council members, at City staff, me.  And when you create a

pattern, you expect that pattern to continue.  And we had every reason to believe he would do it

again and no reason to belief he wouldn't."); Fredstrom Dep. at 22:5-25:16 (recognized

Henneberry's name from prior council and planning meetings where he was disruptive and "very

loud").

Henneberry saw advertisements about an upcoming State of the City address to be held on

April 18, 2013 at a Hilton Hotel in Newark (the "Event").  Henneberry Decl. ¶ 13; *see also* Becker

Decl. ¶ 3; Fredstrom Decl. ¶ 4, ECF No. 89-3.  He looked up further information about the Event

online and was directed to a "Community Events" page on the City of Newark Chamber of

Commerce website.  Henneberry Decl. ¶¶ 13-14 & Ex. A.  The webpage made no mention of

reservations being required, did not state the Event was private or indicate the Chamber of

Commerce was hosting the Event, and stated there "will be gallery seating for those who do not

United States District Court
Northern District of California

1   attend the luncheon." *Id*. ¶ 14 & Ex. A.  He also clicked a link on the Community Events page

2   that directed him to a flyer for the Event, which bore the Newark Chamber of Commerce's and the

3   City of Newark's logos and the title "2013 State of the City Address & Showcase Mayor Al

4   Nagy." *Id*. ¶¶ 14-15 & Ex. B.  The flyer stated, "Registration & Networking Showcase Open

5   (lunch ticket not req.)" and "Gallery Seating Open (no charge)."  *Id*., Ex. B.  It described "New

6   Sponsor Opportunities!" and listed fees associated with different levels of sponsorship; the lower

7   half of the flyer allowed attendees to reserve showcase space and order lunch.  *Id*.  The flyer also

8   stated "[r]eservations are required by April 16" and directed attendees to pay the Chamber of

9   Commerce online or by mail.  *Id*.

10      At 12:05 p.m. on April 18, 2013, Henneberry arrived at the Event.  Henneberry Decl. ¶ 16.

11  He waited in the lobby, filled out a nametag he found at an unstaffed table, helped latecomers fill

12  out nametags, asked them if they were registered to vote, and directed them to the event room.  *Id*.

13  ¶ 17.  Just before 12:30 p.m., he entered the ballroom, where the Event was taking place; he was

14  not asked whether he had a reservation.  *Id*. ¶¶ 18-19.  He sat in the back row of the gallery section

15  of the ballroom.  *Id*.; *see also* Defs.' Ashley Dep. at 60:2-14.  Henneberry wrote on a pad of paper

16  and did not say a word.  Henneberry Decl. ¶ 20.

17      After spotting Henneberry, Becker found Ashley and told her he did not want Henneberry

18  "embarrassing the Mayor" and asking whether there was "some reason why he shouldn't be here."

19  Defs.' Ashley Dep. at 55:6-9, 58:18-59:23; *see also* Becker Decl. ¶¶ 6-7.  Ashley told Becker that

20  Henneberry did not have a reservation, stated "we don't let anybody in who doesn't have a

21  reservation," and assured Becker she would "take care of it."  Defs.' Ashley Dep. at 55:6-9, 94:5-

22  13; *see also* Becker Decl. ¶¶ 7-8 ("Ms. Ashley confirmed that Henneberry did not have a

23  reservation for the Event, and that any person who did not have a reservation was not permitted at

24  the Event.  Ms. Ashley then told me that she would take care of the situation, and she walked over

25  to Henneberry.").  Within a few minutes of Henneberry sitting down in the gallery, Ashley

26  informed him he needed to leave because he had not made a reservation.  Defs.' Ashley Dep. at

27  59:22-25; Henneberry Decl. ¶ 20.  Ashley did not check whether persons in the gallery had

28  reservations until Becker noticed Henneberry in attendance.  Defs.' Ashley Dep. at 51:10-55:5.

Henneberry declined to leave because "[h]e had every right to be there." *Id.* at 61:8-9.

Ashley replied the Event was not a public event as it was run by the Chamber of Commerce and

he did not have a right to be there because he did not make a reservation. *Id*. at 61:10-15; 80:10-

13; Henneberry Decl. ¶ 20; *see also* Becker Decl. ¶ 5 (The Event "was not a City of Newark event.

I did not have control over who was permitted to attend the event."). Henneberry explained that

he was entitled to attend the meeting under the Brown Act.[1] Defs.' Ashley Dep. at 61:17-20;

Henneberry Decl. ¶ 20. At some point, Fredstrom and Newark Police Officer Renny Lawson

joined Ashley. Defs.' Ashley Dep. at 61:25-15. Fredstrom was dispatched to the Event "because

there was some type of disturbance involving Mr. Henneberry." Thornton Decl., Ex. A (Defs.'

Fredstrom Dep.) at 20:5-21:6, ECF No. 89-1. Ashley informed the officers that Henneberry did

not have a reservation and she had asked him to leave, but that he refused to do so. *Id.* at 67:3-12;

Lawson Decl. ¶ 4, ECF No. 89-4.

There is no dispute that Henneberry refused to leave after being asked to do so, but there is

no evidence he was loud, used inappropriate language, was confrontational, or abusive. Defs.'

Fredstrom Dep. at 103:1-105:22; Henneberry Decl. ¶ 20. There is also no dispute that, while

Henneberry was seated, Fredstrom and Lawson grabbed him by the hands and arms and escorted

him out of the building using a rear wrist lock. Defs.' Fredstrom Dep. at 38:16-40:21 & Ex. A

(Incident Report) at 6. When Fredstrom asked Lawson whether he wanted Henneberry detained,

Lawson responded affirmatively. Defs.' Fredstrom Dep. at 40:22-41:7 & Incident Report at 6. At

this point, Fredstrom handcuffed Henneberry and placed him in a patrol car. Incident Report at 6.

Fredstrom then returned to the conference to investigate the incident. *Id*. Henneberry was kept in

the patrol car for 30-45 minutes while Fredstrom conducted his investigation. Henneberry Decl. ¶

22.

Fredstrom took statements from Ashley and several other witnesses who reiterated that

[1] The Brown Act provides that a "majority of the members of a legislative body shall not, outside a meeting authorized by this chapter, use a series of communications of any kind, directly or through intermediaries, to discuss, deliberate, or take action on any item of business that is within the subject matter jurisdiction of the legislative body." Cal. Gov't Code § 54952.2(b)(1). There are a number of exceptions to this requirement. *Id.* §§ 54952.2(c)(1)-(6).

1  they had told Henneberry or had overheard him being told that the Event was private and not open

2  to the public, and that Ashley had asked him to leave but he refused. *See* Incident Report at 6-9.

3  One of the witnesses Fredstrom interviewed was Defendant David Benoun, Newark's City

4  Attorney, who

5  
6  
7  
8  
9

> told me that Linda Ashley had come up to him and said that Mr.
> Henneberry was at the event and that Henneberry was claiming a
> violation of the Brown Act. Benoun said that Ashley told him that if
> Henneberry was to be removed, that Henneberry wanted to speak to
> the city attorney. Benoun agreed and spoke with Henneberry.
> Benoun . . . advised Henneberry that this was a private affair, has
> nothing to do with the city, it's a [Chamber of Commerce] event and
> that if they ask you to leave, it is within their rights.

10  *Id.* at 8. Fredstrom determined he had probable cause to arrest Henneberry for trespassing based

11  on his investigation. Defs.' Fredstrom Dep. at 61:22-62:1. Fredstrom also believed the arrest was

12  supported by Ashley's willingness to sign a Citizen's Arrest form. *Id*. at 62:2-63:9, 73:20-75:12.

13  By the time Fredstrom drove Henneberry to the Newark Police Department, the Event was

14  over, as evidenced by the fact that people were leaving. Henneberry Decl. ¶ 22. Fredstrom

15  continued to interview him at the police station. Defs.' Fredstrom Dep. at 75:13-19; Henneberry

16  Decl. ¶ 23. Fredstrom arrested Henneberry for violating California Penal Code section 602.1(a).[2]

17  *See* Huang Decl. Ex. A (Consolidated Arrest Report). Fredstrom made the decision not to "field

18  cite" him at the Newark Police Station. Defs.' Fredstrom Dep. at 94:25-95:5, 95:10-15 (Newark

19  Police Department policy allows officers either to issue a citation and release somebody from the

20  scene under certain circumstances, or to transport the person to Fremont Jail and have them issue a

21  citation and release the subject after booking). At 2:54 p.m., Fredstrom left the police station to

22  transport Henneberry to the Fremont City Jail. *Id.* at 88:1-13. Persons booked at the Fremont jail

23  are eligible for "cite and release," and Fredstrom intended to tell the officers booking Henneberry

24

25  [2] California Penal Code section 602.1(a) provides that: "Any person who intentionally interferes
with any lawful business or occupation carried on by the owner or agent of a business

26  establishment open to the public, by obstructing or intimidating those attempting to carry on
business, or their customers, and who refuses to leave the premises of the business establishment

27  after being requested to leave by the owner or the owner's agent, or by a peace officer acting at the
request of the owner or owner's agent, is guilty of a misdemeanor, punishable by imprisonment in

28  a county jail for up to 90 days, or by a fine of up to four hundred dollars ($400), or by both that
imprisonment and fine."

5

1    at Fremont City Jail that he was eligible for immediate release and citation. *Id*. at 91:20-93:2.  The

2    cite and release process can take anywhere from 10 minute to hours, depending on how many

3    people are waiting to be booked. *Id*. at 93:21-94:2.  But when they arrived at Fremont Jail,

4    Fredstrom was ordered to take Henneberry and another arrestee to Santa Rita Jail. *Id*. at 91:12-19,

5    94:14-16.

6         Henneberry was booked into Santa Rita Jail where, instead of being cited and released, he

7    was held for more than 30 hours.  Henneberry Decl. ¶ 24.  As a result of this experience, he has

8    drastically reduced his participation in local government and has stopped attending City Council

9    meetings. *Id*. ¶ 26.

10   **B.      Procedural Background**

11        Henneberry filed his initial complaint on November 12, 2013.[3]  ECF No. 1.  The case has

12   since had a lengthy procedural background but relevant here is that on April 26, 2017, Judge

13   James granted summary judgment on Henneberry's remaining claims except his First Amendment

14   retaliation and Bane Act claims.  As to Henneberry's retaliation claim, Judge James found

15   Fredstrom had probable cause to arrest him but allowed the claim to proceed because "[a]

16   reasonable trier of fact could also find this type of arrest would chill a person of ordinary firmness

17   from future First Amendment activities."  MSJ Order at 11, 21 (citing *Ford v. City of Yakima*, 706

18   F.3d 1188, 1199 (9th Cir. 2013)).  As to his Bane Act claim, Judge James held that "[a] reasonable

19   jury could . . . find that Fredstrom's refusal to cite and release [Henneberry] for this misdemeanor

20   from the Newark Police Department and instead to book him at the Fremont City Jail constitutes

21   threats, intimidation, or coercion.  The City would be vicariously liable for any damages resulting

22   from Fredstrom's actions." *Id.* at 29.

23        Defendants filed the present renewed motion on July 18, 2019, seeking summary judgment

24   as to both claims.

25                              **III.    LEGAL STANDARD**

26        Summary judgment is proper where there is "no genuine dispute as to any material fact and

27

28   _____
     [3] The case was initially assigned to Magistrate Judge Maria-Elena James, who retired in August
     2018, after which the case was reassigned to the undersigned.  ECF No. 187.

United States District Court
Northern District of California

1   the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving

2   for summary judgment bears the initial burden of identifying those portions of the pleadings,

3   discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*

4   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that may affect the outcome

5   of the case, and a dispute as to a material fact is genuine if there is sufficient evidence for a

6   reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477

7   U.S. 242, 248 (1986).

8          If the moving party meets its initial burden, the opposing party must then set forth specific

9   facts showing that there is some genuine issue for trial.  Fed. R. Civ. P. 56(c)(1); *Anderson*, 477

10  U.S. at 250.  All reasonable inferences must be drawn in the light most favorable to the

11  nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However,

12  it is not the task of the Court "'to scour the record in search of a genuine issue of triable fact."

13  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden "to

14  identify with reasonable particularity the evidence that precludes summary judgment."  *Id.*  Thus,

15  "[t]he district court need not examine the entire file for evidence establishing a genuine issue of

16  fact, where the evidence is not set forth in the opposing papers with adequate references so that it

17  could conveniently be found."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir.

18  2001).

19         "While the evidence presented at the summary judgment stage does not yet need to be in a

20  form that would be admissible at trial, the proponent must set out facts that it will be able to prove

21  through admissible evidence."  *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010)

22  (citing Fed. R. Civ. P. 56(c) ("An affidavit or declaration used to support or oppose a motion must

23  be made on personal knowledge, set out facts that would be admissible in evidence, and show that

24  the affiant or declarant is competent to testify on the matters stated.")).  Still, to survive summary

25  judgment, the nonmoving party "must set forth non-speculative evidence of specific facts, not

26  sweeping conclusory allegations."  *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d

27  1047, 1061 (9th Cir. 2011) (citations omitted).

28

**IV.  DISCUSSION**

In their motion, Defendants argue that Henneberry's First Amendment retaliation claim is barred because the Court has already determined Fredstrom had probable cause to arrest him, and the Supreme Court's holding in *Nieves* establishes that a retaliation claim must fail in such circumstances.  Mot. at 8.  Defendants acknowledge that *Nieves* "provides a 'narrow qualification' to its ruling, setting forth that the 'no-probable-cause requirement should not apply when a plaintiff provides objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'"  *Id.* at 10 (quoting *Nieves*, 139 S. Ct. at 1727).  However, they argue this exception is inapplicable here because the Supreme Court explained that "this narrow exception is warranted 'for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so.'"  *Id.* (quoting *Nieves*, 139 S. Ct. at 1727).  Defendants note that the offense in question here is trespassing, which they argue cannot be characterized as a crime for which officers rarely affect an arrest.  *Id.*  Defendants further argue there is no evidence that probable cause existed to arrest any other attendee at the Event.  *Id.* at 11.  Defendants note that, in denying their motion for summary judgment on qualified immunity grounds, Judge James relied upon *Ford*, but they argue *Ford* is no longer viable after *Nieves*.  *Id.* at 12-13.  They now request the Court reexamine the decision because Henneberry cannot establish that Fredstrom "was 'plainly incompetent' or 'knowingly violated the law,' such that no reasonable officer could conclude his actions were lawful."  *Id.* at 14.  Finally, as to Henneberry's Bane Act claim, Defendants argue it must also fail because it requires interference with a constitutional or legal right and, as Henneberry suffered no First Amendment retaliation injury and no other claims remain, there can be no liability under the Act.  *Id.*

In response, Henneberry argues *Nieves* "simply does not cover" his claims because, although the Court concluded that "'[t]he plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest,' and '[t]he presence of probable cause should generally defeat a First Amendment retaliatory arrest claim,' . . . it cannot be that probable cause for an arrest immunizes every action by the arresting officer that occurs after the arrest."

8

1   Opp'n at 1 (quoting *Nieves*, 139 S. Ct. at 1724, 1726). Henneberry notes there are two sets of

2   events at issue here: (1) his arrest and (2) whether Fredstrom's decision and actions to book,

3   transport, and jail him were in retaliation for his speech. *Id.* at 1-2. Henneberry maintains his

4   First Amendment claim is grounded on the latter, "on the conduct and punishment flowing from

5   his arrest," including his transportation to Santa Rita Jail and detention there for approximately 30

6   hours. *Id.* at 2. "As a result, *Nieves*'s general rule that a plaintiff must plead and prove an absence

7   of probable cause, and that a finding of probable cause precludes a retaliatory arrest claim, does

8   not apply." *Id.* Henneberry argues that, even if *Nieves*'s general rule were to apply to his claims,

9   they fall within the exception to that rule because he was arrested and jailed for misdemeanor

10  trespass under California Penal Code section 602, "[b]ut hardly anyone is arrested or cited for this

11  offense." *Id.* To the extent the Court determines there is insufficient evidence to make this

12  determination, Henneberry requests it deny or defer Defendants' motion under Rule 56(d) while

13  discovery is reopened. *Id.* Finally, Henneberry argues Fredstrom is not entitled to qualified

14  immunity "because at the time of his conduct here, it was clearly established that an officer 'could

15  not exercise his discretion to book an individual in retaliation for that individual's First

16  Amendment activity.'" *Id.* at 3 (quoting *Ford*, 706 F.3d at 1196).

17  **A.    First Amendment**

18      **1.    Retaliation**

19      "'[T]he First Amendment prohibits government officials from subjecting an individual to

20  retaliatory actions' for engaging in protected speech." *Nieves*, 139 S. Ct. at 1722 (quoting

21  *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "If an official takes adverse action against someone

22  based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the

23  adverse consequences,' the injured person may generally seek relief by bringing a First

24  Amendment claim." *Id.* (quoting *Hartman*, 547 U.S. at 256). "To prevail on such a claim, a

25  plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory

26  animus' and the plaintiff's 'subsequent injury.' *Id.* (quoting *Hartman*, 547 U.S. at 259). "It is not

27  enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—

28  the motive must cause the injury. Specifically, it must be a 'but-for' cause, meaning that the

9

1    adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.*

2    (citing *Hartman*, 547 U.S. at 260).

3        As Judge James previously ruled, Fredstrom had probable cause to arrest Henneberry

4    under California Penal Code section 602.1(a). MSJ Order at 8-12. The Court finds Judge James's

5    decision well-reasoned and adopts it here. However, she also found evidence of a retaliatory

6    motive in that

7            (1) Fredstrom knew Plaintiff from prior encounters at City Council
             and City Planning Meetings, where he had found Plaintiff "very loud"
8            and disruptive; (2) as a result of these past interactions, Fredstrom in
             fact recognized Plaintiff by name when he was dispatched to the
9            Hilton Hotel during the Conference; (3) Lawson instructed Fredstrom
             to detain Plaintiff, but he did not direct Fredstrom to arrest Plaintiff;
10           and (4) even after arresting Plaintiff, Fredstrom had the discretion to
             cite and release him from the Newark Police Station, but he made the
11           decision not to do so and instead drove Plaintiff to be booked at the
             Fremont City Jail.
12

13    *Id.* at 19. Based on this evidence, she determined that "[a] reasonable trier of fact also could find

14    this type of arrest would chill a person of ordinary firmness from future First Amendment

15    activities." *Id.* at 21 (citing *Ford*, 706 F.3d at 1193). Judge James thus denied summary judgment

16    as to Henneberry's First Amendment retaliation claim because Defendants failed to rebut the

17    circumstantial evidence of retaliatory motive. *Id.*

18        Defendants now argue that, in light of *Nieves*, the fact that Fredstrom had probable cause

19    to arrest Henneberry defeats any claim that his arrest was in retaliation for speech protected by the

20    First Amendment. Mot. at 6. In *Nieves*, the Supreme Court recognized the Ninth Circuit's

21    previous holding that a plaintiff could prevail on a First Amendment retaliatory arrest claim even

22    in the face of probable cause for arrest. 139 S. Ct. at l72l (citing *Bartlett v. Nieves* 712 Fed. App'x

23    613 (9th Cir. 2017). However, the Supreme Court determined that such an evaluation, in the face

24    of a finding of probable cause, is improper, holding that a plaintiff's First Amendment retaliation

25    claim related to arrest cannot succeed where the defendant officers had probable cause to arrest

26    plaintiff. *Id.* at 1728 ("Because there was probable cause to arrest [plaintiff], his retaliatory arrest

27    claim fails as a matter of law.") In doing so, the Court found that "probable cause speaks to the

28    objective reasonableness of an arrest" and that "its absence will . . . generally provide weighty

                                            10

1    evidence that the officer's animus caused the arrest, whereas the presence of probable cause will

2    suggest the opposite." *Id.* at 1724 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011).

3    Additionally, the Supreme Court reiterated that "when reviewing an arrest, we ask 'whether the

4    circumstances, viewed objectively, justify [the challenged] action,' and if so, conclude 'that action

5    was reasonable *whatever* the subjective intent motivating the relevant officials.'" *Id.* at 1725

6    (alteration and emphasis in original) (quoting *al-Kidd*, 563 U.S. at 736).

7          Given that Fredstrom had probable cause to arrest Henneberry, it is clear that *Nieves* would

8    not permit Henneberry to pursue a First Amendment retaliation claim based on that arrest.

9    Defendants argue Henneberry also cannot satisfy *Nieves*'s no probable cause requirement as to the

10   subsequent actions because they were tied to the initial arrest.  Reply at 4.  However, it is not clear

11   that *Nieves* protects an officer from all subsequent action after an arrest, which here includes

12   Fredstrom's decision to transport Henneberry to the Newark Police Department, his decision not

13   to "field cite" him at the Newark Police Station and to instead transport him to Fremont City Jail,

14   and Henneberry's ultimate transfer to Santa Rita Jail, where he was jailed for 30 hours.

15   Henneberry alleges these actions were all in retaliation for his speech.  As Judge James observed

16   in her decision, Henneberry's claim is based on the "narrow question: whether Fredstrom's desire

17   to chill Plaintiff from engaging in future First Amendment activities was a but for cause of his

18   decision not to cite and release Plaintiff from the Newark Police Department."  MSJ at 29.  Given

19   the post-arrest conduct at issue here, it is not clear that *Nieves* prohibits such claims.

20          **2.      *Nieves* Exception**

21          Even if *Nieves* were to immunize all post-arrest conduct, Henneberry argues his claims fall

22   within an exception to *Nieves*'s general rule.  Mot. at 11-12.  In *Nieves*, the Court emphasized that

23   "[a]lthough probable cause should generally defeat a retaliatory arrest claim," there is an exception

24   when officers have probable cause but typically exercise their discretion not to make arrests.  139

25   S. Ct. at 1727. Thus, the "no-probable-cause requirement should not apply when a plaintiff

26   presents objective evidence that he was arrested when otherwise similarly situated individuals not

27   engaged in the same sort of protected speech had not been."  *Id.*  Henneberry contends that is the

28   case here because Newark Police records show they rarely cite or arrest individuals for the

11

1    offenses for which he was arrested and jailed. Mot. at 11. He cites to records showing that from

2    2012 to present, there were only 14 citations or bookings for violations of California Penal Code

3    sections 602(o) or 602.1(a) by the Newark Police. *Id.* at 11-12 (citing Horn Decl., Ex. A (Newark

4    Police Records), ECF No. 228-1). Thus, even if the Court were to conclude that Henneberry's

5    First Amendment retaliation claim is a retaliatory arrest claim like that in *Nieves*, he argues this

6    exception applies and he is not required to plead and prove an absence of probable cause. *Id.* at

7    12. Alternatively, if the Court finds that the Newark Police records do not establish that his claim

8    falls within *Nieves*'s exception, Henneberry argues Defendants' motion still should be denied or

9    deferred pursuant to Federal Rule of Civil Procedure 56(d) for additional discovery related to

10   police records and discretion regarding arrests under California Penal Code section 602.

11          While the standard for this "narrow qualification" has not been further clarified since

12   *Nieves*, the Supreme Court used the example of jaywalking, which "is endemic but rarely results

13   in arrest." *Nieves*, 139 S. Ct. at 1727. The Court reasoned that "[i]f an individual who has been

14   vocally complaining about police conduct is arrested for jaywalking at such an intersection, it

15   would seem insufficiently protective of First Amendment rights to dismiss the individual's

16   retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest." *Id.*

17   That could be the case here, where it is undisputed that for several years leading up to the Event,

18   Henneberry attended many, if not every, City Council meeting held by the City of Newark, that he

19   actively criticized City officials, and that he was well known to Defendants Becker, Fredstrom,

20   and Ashley because he was disruptive and complained too much. Within a few minutes of

21   Henneberry sitting down in the gallery, Ashley informed him he needed to leave because he had

22   not made a reservation, yet Ashley did not check whether persons in the gallery had reservations.

23   After Henneberry stated he felt he was entitled to attend the meeting under the Brown Act,

24   Fredstrom was dispatched to the Event "because there was some type of disturbance involving Mr.

25   Henneberry." There is no evidence he was loud, used inappropriate language, was

26   confrontational, or abusive. There is also no dispute that, while Henneberry was seated,

27   Fredstrom and Lawson grabbed him by the hands and arms and escorted him out of the building

28   using a rear wrist lock, handcuffed him and arrested him. Given Henneberry's reputation as a

12

1    vocal critic of City officials, coupled with his proffered evidence regarding Newark Police's

2    citations for trespass in similar circumstances, the Court finds the *Nieves* exception could apply.

3          **3.     Qualified Immunity**

4          As part of their renewed motion, Defendants request the Court reconsider Judge James's

5    previous ruling that Fredstrom is not entitled to qualified immunity.  Mot. at 12-14; MSJ Order at

6    22-23.  Defendants note that Judge James relied upon *Ford* but argue that case has been abrogated

7    by *Nieves*.  Mot. at 13.  However, while *Nieves* did reverse *Ford*, it did so solely on the ground

8    that a plaintiff cannot sustain a retaliatory arrest claim if there is probable cause for the arrest.  The

9    Court did not address qualified immunity.  Regardless, Judge James did not rely solely on *Ford*

10   and there is no indication that the law on qualified immunity has changed since the time of her

11   ruling.

12         "The doctrine of qualified immunity protects government officials from liability for civil

13   damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or

14   constitutional right, and (2) that the right was 'clearly established' at the time of the challenged

15   conduct.'"  *Wood v. Moss*, 572 U.S. 744, 745 (2014) (quoting *al-Kidd*, 563 U.S. at 735).  In

16   *Saucier v. Katz*, the Supreme Court set forth a two-part approach for analyzing qualified

17   immunity: (1) "Taken in the light most favorable to the party asserting the injury, do the facts

18   alleged show the officer's conduct violated a constitutional right?"; and (2) if the court determines

19   that a constitutional violation could be made out based on the parties' submissions, it must ask

20   "whether the right was clearly established."  533 U.S. 194, 201 (2001).  "The relevant, dispositive

21   inquiry in determining whether a right is clearly established is whether it would be clear to a

22   reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* at 202.  "The

23   protection of qualified immunity applies regardless of whether the government official's error is 'a

24   mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"

25   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567

26   (2004) (Kennedy, J., dissenting)).

27         The Supreme Court has stated that a "clearly established" constitutional right "should not

28   be defined 'at a high level of generality.'"  *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *al-*

                                              13

1   *Kidd*, 563 U.S. at 742). Rather, it must be "particularized" to the facts of the case. *Id.* (quoting

2   *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Defining the right at too high a level of

3   generality "avoids the crucial question whether the official acted reasonably in the particular

4   circumstances that he or she faced." *Plumhoff v. Ricard*, 572 U.S. 765, 779 (2014). "[A]

5   defendant cannot be said to have violated a clearly established right unless the right's contours

6   were sufficiently definite that any reasonable official in the defendant's shoes would have

7   understood that he was violating it." *Id.* "In other words, 'existing precedent must have placed

8   the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (quoting

9   *al-Kidd*, 563 U.S. at 741). "A right can be clearly established despite a lack of factually analogous

10  preexisting case law, and officers can be on notice that their conduct is unlawful even in novel

11  factual circumstances." *Ford*, 706 F.3d at 1195 (citation omitted); *see also Hope v. Pelzer*, 536

12  U.S. 730, 741 (2002) ("officials can still be on notice that their conduct violates established law

13  even in novel factual circumstances."). "The relevant inquiry is whether, at the time of the

14  officers' action, the state of the law gave the officers fair warning that their conduct was

15  unconstitutional." *Ford*, 706 F.3d at 1195 (citing *Hope*, 536 U.S. at 741 ("[T]he salient question

16  that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave

17  respondents fair warning that their alleged treatment of Hope was unconstitutional.").

18          As discussed above, Henneberry has established the existence of genuine dispute as to

19  whether Fredstrom violated his First Amendment rights by retaliating against him for his free

20  speech activities. Thus, the Court must determine whether Fredstrom violated clearly established

21  law at the time of his actions. Judge James found it was "clearly established in April 2013 that

22  officers could not exercise their discretion to 'automatically' book individuals even though they

23  had probable cause to arrest them if the booking officer was retaliating against the individual for

24  exercising his or her First Amendment rights." MSJ Order at 23 (citing *Ford*, 706 F.3d at 1196).

25  In *Ford*, the court found that "[a] reasonable officer would have understood that he did not

26  automatically possess the authority to book and jail an individual upon conducting a lawful arrest

27  supported by probable cause." 706 F.3d at 1196. *Ford*, decided in February 2013, concerned an

28  officer's decision to book an arrestee in 2007. *Id.* at 1995. The Court noted that "[a]t the time the

14

United States District Court
Northern District of California

1  officers acted in 2007, the law in this Circuit gave fair notice that it would be unlawful to jail Ford

2  in retaliation for his First Amendment activity." *Id.* In this case, as the allegations took place in

3  April 2013, the Court finds this right was clearly established at that time and a reasonable officer

4  in Fredstrom's position would have known in April 2013 that he could not exercise his discretion

5  in retaliation for Henneberry's First Amendment activity.

6          Finally, the Court must determine whether Fredstrom "reasonably but mistakenly" could

7  have believed his conduct did not violate his rights. Qualified immunity applies whether the error

8  is a mistake of law or fact, or mixed question of law and fact. *See Pearson*, 555 U.S. at 231.

9  Judge James found "there is nothing in the record that suggests Fredstrom reasonably believed his

10  conduct did not violate Plaintiff's rights." MSJ Order at 23. She noted the only evidence

11  Defendants presented was Fredstrom's "conclusory declaration that he did not intend to interfere

12  with" Henneberry's First Amendment rights, but such evidence "does not establish the grounds for

13  reasonable mistake; at most, it creates a triable issue of fact whether Fredstrom acted in

14  retaliation." *Id.* Defendants provide no additional evidence on this issue in their renewed motion.

15  Accordingly, the Court agrees with Judge James's decision and therefore finds Defendants have

16  not established Fredstrom is entitled to qualified immunity.

17          **4.      Conclusion**

18          Based on this analysis, the Court **DENIES** Defendants' renewed motion for summary

19  judgment as to Henneberry's First Amendment retaliation claim.

20  **B.      Bane Act Claim**

21          The Bane Act provides a private right of action against a person who interferes by "threats,

22  intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the

23  exercise or enjoyment by any individual or individuals of rights secured by the Constitution or

24  laws of the United States, or of the rights secured by the Constitution or laws of this state . . . ."

25  Cal. Civ. Code § 52.1. "There are two distinct elements for a section 52.1 cause of action. A

26  plaintiff must show (1) intentional interference or attempted interference with a state or federal

27  constitutional or legal right, and (2) the interference or attempted interference was by threats,

28  intimidation or coercion." *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015), *as*

1   *modified on denial of reh'g* (Mar. 6, 2015) (citations omitted).  "[W]here coercion is inherent in

2   the constitutional violation alleged, such as an alleged false arrest or unlawful detention, section

3   52.1 requires a showing of coercion independent from the inherent coercion in the alleged

4   violation." *Spindler v. City of Los Angeles*, 2018 WL 6136791, at *13 (C.D. Cal. Mar. 12, 2018)

5   (citing *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1196 (9th Cir. 2015) (unlawful detention and

6   search); *Allen*, 234 Cal. App. 4th at 69 (false arrest); *Shoyoye v. City of Los Angeles*, 203 Cal.

7   App. 4th 947, 959-60 (2012) (unlawful detention)).

8           Defendants argue Henneberry's Bane Act is barred because he cannot establish that

9   Fredstrom's conduct constituted a violation of any his constitutional or legal rights.  Mot. at 14.

10  However, as discussed above, genuine issues exist as to whether Fredstrom violated his First

11  Amendment rights.  As Judge James found, "[a] reasonable jury could further find that

12  Fredstrom's refusal to cite and release Plaintiff for this misdemeanor from the Newark Police

13  Department and instead to book him at the Fremont City Jail constitutes threats, intimidation, or

14  coercion."  MSJ at 28-29.  Judge James also found the City "would be vicariously liable for any

15  damages resulting from Fredstrom's actions."  *Id.* at 29 (citing *Robinson v. Solano Cty.*, 278 F.3d

16  1007, 1016 (9th Cir. 2002)).  The Court finds Judge James's decision well-reasoned and adopts it

17  here.  Accordingly, the Court **DENIES** Defendants' renewed motion for summary judgment as to

18  Henneberry's Bane Act claim.

19                              **V.    CONCLUSION**

20          Based on the analysis above, the Court hereby **DENIES** Defendants' renewed motion for

21  summary judgment.  The Court shall conduct a case management conference on September 26,

22  2019 at 10:00 a.m. in Courtroom A, 15th Floor, 450 Golden Gate Avenue, San Francisco.  The

23  parties shall file an updated joint case management statement by September 19, 2019.  No

24  chambers copy is required.

25          **IT IS SO ORDERED.**

26  Dated: September 4, 2019

27

28
                                                    THOMAS S. HIXSON
                                                    United States Magistrate Judge